DECISION
{¶ 1} Relator, Dayton Foods Limited Partnership, has filed this original action requesting that this court issue a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its orders denying relator's motion to terminate temporary total disability ("TTD") compensation and granting respondent Joseph Unger's ("claimant") motion for authorization of arthroscopic shoulder surgery, and to enter new orders granting relator's motion to terminate TTD compensation and denying claimant's motion for authorization of arthroscopic shoulder surgery.
 {¶ 2} The matter was referred to a magistrate of this court pursuant to Civ.R. 53(C) and Loc.R. 12(M) of the Tenth District Court of Appeals. The magistrate issued a decision, including findings of fact and conclusions of law. (Attached as Appendix A.) The magistrate concluded that the commission did not abuse its discretion in denying relator's motion to terminate TTD, by granting authorization for the arthroscopic shoulder surgery, or by "ordering the continuation of TTD compensation based upon the C-84s from Dr. Paley dated February 11, 2002 and April 15, 2002." The magistrate recommended that this court deny relator's request for a writ of mandamus. Relator has filed objections to the magistrate's decision, and the matter is now before this court for independent review.
 {¶ 3} Relator's objections to the contrary, this court finds that the magistrate has properly discerned the pertinent facts and applied the relevant law to those facts. Accordingly, relator's objections to the magistrate's decision are hereby overruled. Pursuant to Civ.R. 53(E)(4)(b), this court adopts the magistrate's May 29, 2003 decision as its own, including the findings of fact and conclusions of law contained therein. In accordance with the magistrate's decision, this court hereby denies the requested writ of mandamus.
Objections overruled; writ denied.
Bryant and Brown, JJ., concur.
 IN MANDAMUS {¶ 4} In this original action, relator, Dayton Foods Limited Partnership, requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its orders denying relator's motion to terminate temporary total disability ("TTD") compensation and granting the claimant's motion for authorization of arthroscopic shoulder surgery, and to enter new orders granting relator's motion to terminate TTD compensation and denying the claimant's motion for authorization of arthroscopic shoulder surgery.
 Findings of Fact {¶ 5} 1. On June 7, 2000, Joseph Unger ("claimant") sustained an industrial injury while employed as a bakery manager at a Cub Foods Store operated by Dayton Foods Limited Partnership ("Dayton Foods"), a self-insured employer under Ohio's workers' compensation laws. The industrial claim was ultimately allowed for "left shoulder/arm sprain, left shoulder AC arthralgia with evidence of rotator cuff tendonitis and impingement syndrome," and is assigned claim No. 00-813738.
 {¶ 6} 2. Although Dayton Foods contested the claim, the commission initially allowed it for "left shoulder/arm sprain."
 {¶ 7} 3. On December 15, 2000, claimant was examined on behalf of Dayton Foods by Jose Luis Chavez, M.D., who issued a report. His report indicates that the industrial claim was, at that time, still allowed for "left shoulder strain." His report also briefly describes the medical history of the claim prior to the examination:
 {¶ 8} "He indicates that this claim had its inception on 6-7-00 as he was pulling a cart. This is a cabinet that weighed at least 125 pounds and was stocked heavy. As he pulled it, it tipped over, he tried to stabilize it so it wouldn't fall and in the process he strained his left shoulder. The cabinet fell anyway and also braced his left elbow and the left knee. He states that he was not seen by a doctor immediately, however he continued to experience pain over the shoulder and several weeks later he was seen at the Huber Heights Medical Center. X-rays were obtained. He was diagnosed having sustained a left shoulder strain. He was given one cortisone injection and recom-mended for a course of physical therapy for which he had at least 4 weeks of it. States that the therapy helped him to some degree. No other testing has been recommended. States that he was recommended to be seen by an orthopedic physician but this has not been authorized by the company. No other tests have been done. To this date, no surgery has been done or recommended. Wears no braces or appliances. No additional medications have been given and only testing has consisted of a set of plain x-rays."
 {¶ 9} Dr. Chavez opined that the left shoulder strain had reached maximum medical improvement ("MMI").
 {¶ 10} 4. Claimant's first visit with Kevin J. Paley, M.D., occurred on February 15, 2001, some eight months after the industrial injury. Dr. Paley is an orthopedic surgeon. In his February 15, 2001 office note, Dr. Paley notes that claimant "is currently working," and that the claim is allowed for "left shoulder sprain." Dr. Paley further wrote:
 {¶ 11} "I do not think he has reached maximum medical improvement. I have had the pleasure of reviewing the independent medical evaluation by Dr. Chavez, and I do not think that an appropriate orthopedic examination was done on the left shoulder. Dr. Chavez does not mention testing the rotator cuff or evaluating for rotator cuff impingement. I feel that Joe is suffering from rotator cuff tendinitis and impingement secondary to his shoulder sprain. This need[s] to be documented. I told him to contact his attorney to set up a hearing in order to facilitate this claim allowance. This may require an MRI. We will submit a change of physician, and once I am the physician of record, I will proceed with appropriate workup. Will follow up in three weeks. * * *"
 {¶ 12} 5. Following a March 1, 2001 office visit, Dr. Paley wrote:
 {¶ 13} "Joseph Unger is follow-up of a left shoulder sprain, 840.9. He is still having symptoms of pain. The claim is still pending. Allowance for the rotator tendonitis and impingement. I think I am also waiting to be the physical [sic] of record at this time. There has been no improvement.
 {¶ 14} "* * *
 {¶ 15} "* * * We will submit a C9 for the MRI of the left shoulder using a sprain code. * * *"
 {¶ 16} 6. Following an April 16, 2001 office visit, Dr. Paley wrote:
 {¶ 17} "* * * His request for an MRI was denied since the patient was declared maximally medically improved based on the independent medical examination of Dr. Chavez. * * *
 {¶ 18} "* * *
 {¶ 19} "DISPOSITION AND PLAN: I've instructed Joseph to contact his attorney with regards to the claim allowance and the maximal [sic] medical improvement rating. In my opinion he requires an MRI of the shoulder to assess the rotator cuff and prove to the industrial commission that his shoulder has not reached maximal [sic] medical improvement. With the MRI we could amend the claim to include rotator cuff tendonitis and possible rotator cuff tear based on the MRI findings. * * *"
 {¶ 20} 7. Following an April 26, 2001 office visit, Dr. Paley wrote:
 {¶ 21} "* * * Joseph is here for evaluation of his left shoulder. He continues to be symptomatic with complaints of pain and weakness about his left shoulder region. He cannot sleep on the shoulder. He has an independent medical examination scheduled for May 29th. He's currently not working. At this time, we are awaiting claim allowance to proceed with appropriate workup and treatment.
 {¶ 22} "* * * Examination shows painful range of motion of the shoulder. He continues to have impingement signs and moderate rotator cuff weakness secondary to pain. He has developed pain on the anterior aspects of the shoulder to palpation. * * *
 {¶ 23} "* * *
 {¶ 24} "* * * Left shoulder sprain
 {¶ 25} "* * * The patient continues to require an MRI as well as probable arthroscopic subacromial decompression of the shoulder. Based on his symptoms and job requirements I will have him off work through June 26, 2001."
 {¶ 26} 8. On April 26, 2001, Dr. Paley completed a C-84 on which he certified TTD beginning April 26, 2001 to an estimated return-to-work date of June 26, 2001. On the C-84, Dr. Paley indicated that claimant is unable to return to his former position of employment and that claimant is unable "to return to other employment including light duty alternative work, modified work or transitional work."
 {¶ 27} 9. The next day, April 27, 2001, Dayton Foods' Director of Human Resources, Jeff Farley ("Mr. Farley"), faxed to Dr. Paley the following letter:
 {¶ 28} "This letter is in response to the disability slip that Joseph Unger submitted on April 26, 2001.
 {¶ 29} "We have an aggressive return to work policy and actively attempt to return individuals to work within the work restrictions placed upon them. It is our belief that this policy is in the best interest of the employee as it allows them to return to work that is within their restrictions without losing any compensation.
 {¶ 30} "As such, we are requesting that you complete and return the attached Attending Physician Report as soon as possible.
 {¶ 31} "I believe we have a great opportunity to return Joseph to work, when considering that he is in a manager's position and we have many options to consider in adapting to any restrictions."
 {¶ 32} 10. Because Dr. Paley had not responded to the fax by May 3, 2001, on that date, Mr. Farley faxed to Dr. Paley another letter stating:
 {¶ 33} "I am sending you this letter to once again request that you complete the Attending Physician Report for Joseph Unger that was faxed to you on April 27, 2001 (a copy was also directed to you and Mr. Unger via the U.S. postal service on the same date). I have also taken the liberty of attaching another copy of the same report. Your delay in responding to this request is directly impacting Mr. Unger's compensation.
 {¶ 34} "I want to again emphasize that we have an aggressive return to work policy and actively attempt to return individuals to work within the work restrictions placed upon them. It is our belief that this policy is in the best interest of the employee as it allows them to return to work that is within their restrictions without losing any compensation.
 {¶ 35} "When you take into consideration that his allowed condition and/or your request for additional conditions, all involve his left shoulder, I am certain that Mr. Unger can return to work as a manager with restrictions that allow for these conditions."
 {¶ 36} 11. Apparently, on May 7, 2001, Dr. Paley faxed to Mr. Farley a copy of Mr. Farley's May 3, 2001 letter. On the May 3, 2001 letter, Dr. Paley wrote in his own hand:
 {¶ 37} "You are the one delaying compensation and treatment for Mr. Unger — NOT ME. Kindly approve the previously requested treatment plan. Mr. Unger probably would have returned to work by now if you would approve treatment."
 {¶ 38} 12. Also on May 7, 2001, Dr. Paley faxed to Mr. Farley the completed medical form that Mr. Farley had been requesting. On the form, Dr. Paley wrote in his own hand: "OFF work thru 6/26 until TX [treatment] provided." On the form, Dr. Paley also placed checkmarks. One checkmark indicates "[s]edentary work." Another checkmark indicates "[i]n an 8 hour workday patient may: Stand/Walk 1-4 hrs sit 5-8 hrs." Another checkmark indicates "[p]atient may use hand(s) for repetitive fine manipulation."
 {¶ 39} 13. Presumably, on May 8, 2001, Mr. Farley faxed to Dr. Paley a letter dated May 8, 2001, stating:
 {¶ 40} "This letter is in response to your fax of May 7, 2001.
 {¶ 41} "First, we are not denying treatment to Mr. Unger. The treatment that you are referring to can proceed and be submitted for approval through our medical insurance plan, Anthem.
 {¶ 42} "At this time, further treatment under the worker's compensation claim cannot be approved. This is based on the determination that Mr. Unger was at maximum medical improvement as of the independent medical examination of December 7, 2000.
 {¶ 43} "Second, Mr. Unger can return to work as the Bakery Manager under the restrictions you placed on the Attending Physician's Report, faxed on May 7, 2001.
 {¶ 44} "This work would require him to sit at his desk working with his computer. His job duties while at his desk would consist of:
 {¶ 45} "* * * Completion of the action plan projects given to him on April 26, 2001[.]
 {¶ 46} "* * * He would also be responsible for completing the weekly work schedules of all of the bakery employees[.]
 {¶ 47} "* * * He would also be responsible for scheduling all store orders in the production schedule per order delivery requirements.
 {¶ 48} "He would also need to attend management meetings as scheduled.
 {¶ 49} "These job requirements comply with all of the restrictions that you indicated on the 5/7/01 report. The company will comply and will require Mr. Unger to comply with the restrictions contained within the 5/7/01 report.
 {¶ 50} "Please respond back to me by Friday, May 11, 2001, indicating your acceptance of the job modifications as outlined above."
 {¶ 51} 14. Apparently, Dr. Paley did not respond to Mr. Farley's May 8, 2001 fax by May 11, 2001.
 {¶ 52} 15. On May 24, 2001, claimant had another office visit with Dr. Paley. Dr. Paley wrote:
 {¶ 53} "* * * He had a independent medical examination on May 22nd, 2001.
 {¶ 54} "* * *
 {¶ 55} "DISPOSITION AND PLAN: The patient continues to require an arthroscopic subacromial decompression. The patient's caseworker refuses to allow an MRI of the shoulder. I will submit another request for the arthroscopic subacromial decompression and hopefully with the independent medical examination findings we can proceed with appropriate treatment for the patient. The patient cannot work at this time due to his symptoms and I will extend his disability through June 28, 2001. I am quit frustrated with the delay in appropriate treatment for this patient. The patient could have return[ed] to work at this time if his treatment had been approved [in] a timely fashion. I will reassess the patient in three weeks time."
 {¶ 56} 16. On May 24, 2001, Dr. Paley wrote to Mr. Farley as follows:
 {¶ 57} "I've had the pleasure of evaluating Mr. Joseph Unger for his injured left shoulder. He continues to be symptomatic and requires an arthroscopic subacromial decompression of the shoulder. As you know, numerous attempts have been made to proceed with an MRI of the shoulder in order to amend his claim to the correct diagnosis of left shoulder rotator cuff tendinitis. To date, all request[s] have been denied. Until appropriate treatment is allowed for Mr. Unger I will keep him off work. He is not able to perform light-duty of any kind. Kindly approved [sic] treatment for Mr. Unger. As I previously discussed with you Mr. Unger could have return[ed] to work full duty if his treatment plan had not unnecessarily been delayed."
 {¶ 58} 17. On June 12, 2001, claimant had another office visit with Dr. Paley. Dr. Paley wrote:
 {¶ 59} "Joseph is here for evaluation of his left shoulder. He continues to be symptomatic with complaints of pain. He informs me that he * * * [has] lost his job and has to move to St. Louis, Missouri. He is currently awaiting claim allowance.
 {¶ 60} "* * *
 {¶ 61} "* * * I recommend that the patient undergo an arthroscopic examination of the shoulder. At this time numerous attempts have been * * * [made] to proceed with an MRI of the shoulder. To date[,] all request[s] have been denied. * * *"
 {¶ 62} 18. On June 19, 2001, claimant was examined by Wayne C. Woodward, M.D., on behalf of the Ohio Bureau of the Workers' Compensation ("bureau"). Dr. Woodard wrote:
 {¶ 63} "IMPRESSION: Left shoulder AC arthralgia with evidence of rotator cuff tendinitis and impingement syndrome.
 {¶ 64} "PLAN: I feel that this patient clearly has findings as noted by Dr. Paley associated with the rotator cuff impingement and probable AC disease. Additionally, this could clearly be directly related to the significance of the trauma to the shoulder by the patient's history and also clarified by review in the records. I do not think this patient has reached maximum medical improvement and I feel that an MRI would be of appropriate testing if this patient has not responded to conservative management by this point. Additionally, injections would need to be approved also, including AC injection and injection in the subacromial space. This is also objective testing to document the absence of [sic] presence of impingement syndrome."
 {¶ 65} 19. On June 27, 2001, Mr. Farley sent the following letter to claimant:
 {¶ 66} "This letter is to notify you that you have failed to return to work after a leave of absence (return to work date of June 27, 2001).
 {¶ 67} "Company policy states that failure to return to work after a leave of absence is considered a voluntary quit.
 {¶ 68} "Also, company policy states that being absent without reporting for three (3) consecutive workdays is considered an automatic quit.
 {¶ 69} "You must contact me by 8 AM, Eastern Standard Time, Friday, June 29th, 2001, or you will be subject to these policies."
 {¶ 70} 20. On July 11, 2001, claimant had another office visit with Dr. Paley. Dr. Paley wrote:
 {¶ 71} "* * * Joseph is here for evaluation of his left shoulder. He has been approved for a left shoulder MRI. He is currently living in St. Louis, Missouri due to his financial situation. He continues to be symptomatic with complaints of left shoulder pain. He is unable to relocate back to Dayton at this time because of his financial situation. He is currently living with family. * * *
 {¶ 72} "* * *
 {¶ 73} "DISPOSITION AND PLAN: I would like to proceed with MRI of the left shoulder. At this time Joseph is unable to return to work at his former place of employment in Dayton, Ohio due to his financial situation. * * *"
 {¶ 74} 21. On July 25, 2001, Dayton Foods moved that TTD compensation "be terminated due to the treating physician's failure to respond to light duty job offer."
 {¶ 75} 22. On July 26, 2001, Mr. Farley wrote to claimant as follows:
 {¶ 76} "Based upon Dr. Paley's office notes of July 11th, 2001, you are required to report to work and perform the duties of Bakery Director.
 {¶ 77} "It is clear from Dr. Paley's office notes that you are now physically able to perform the duties of Bakery Director, as outlined in the May 8, 2001 letter to yourself and Dr. Paley.
 {¶ 78} "Joe, if you do not return to work by 8 A.M. on Monday, August 6th, 2001, then it shall be determined that you voluntarily quit your position and your employment will be terminated."
 {¶ 79} 23. On August 8, 2001, Mr. Farley again wrote to the claimant as follows:
 {¶ 80} "Mr. Unger, you did not return to work by 8 A.M. on Monday, August 6th, 2001 as was required in the letter dated July 26, 2001.
 {¶ 81} "Therefore, based upon your actions, you have voluntarily quit your position with Dayton Foods Limited Partnership (operating the Dayton Area Cub Foods and C.J. Farms Bakery) effective Monday, August 6, 2001."
 {¶ 82} 24. On August 11, 2001, claimant underwent an MRI of the left shoulder. On August 15, 2001, the interpreting radiologist, Stephen Abrams, M.D., wrote:
 {¶ 83} "A small subchondral cyst is seen in the posterior humeral head. No bone marrow edema is seen to suggest bone contusion or fracture. No significant joint effusion is noted. A type I acromion process is present. No significant left acromioclavicular joint hypertrophy is seen. The tendon of the long head of the biceps muscle is in its expected location, in the bicipital groove. The glenoid labrum is grossly intact. No rotator cuff tear is identified. There is a 9.0 x 7.0 x 5.0 millimeter object noted along the anterior aspect of the humeral head, the signal characteristics of which follow those of bone, possibly representing a loose body."
 {¶ 84} 25. Following an October 10, 2001 hearing, a district hearing officer ("DHO") issued an order denying Dayton Foods July 25, 2001, motion to terminate TTD compensation. The DHO's order states:
 {¶ 85} "The employer argued that temporary total disability compensation should be terminated because the physician of record had not responded to the employer's request to certify light duty employment. The employer further argued that the claimant voluntarily terminated his employment on 08/06/2001 and that the claimant is currently receiving treatment for unallowed conditions.
 {¶ 86} "The physician of record's failure to adequately respond to the self-insured employer does not constitute a basis to terminate temporary total disability compensation. The District Hearing Officer notes that Dr. Paley, the physician of record, stated that claimant could not perform any work until an MRI is performed. An MRI was not obtained until 08/14/2001. The District Hearing Officer further notes that on C-84s dated 06/14/2001 and 08/12/2001 Dr. Paley indicated that claimant could not perform any light duty employment. Thus, even though the employer may be able to adhere to any medical restrictions, there is simply no evidence from a medical provider that the claimant can return to such work.
 {¶ 87} "Next, the employer argued that they offered employment to the claimant on 07/26/2001 and that the claimant's failure to respond resulted in his voluntary termination on 08/06/2001. The District Hearing Officer disagrees. Again, the medical documentation does not indicate that the claimant can return to restricted work. As such, claimant's absence form the work force is not voluntary, but due to the allowed conditions in the claim.
 {¶ 88} "* * *
 {¶ 89} "Accordingly, the District Hearing Officer orders the continued payment of temporary total disability compensation upon the further submission of appropriate medical evidence."
 {¶ 90} 26. Dayton Foods administratively appealed the October 10, 2001 DHO's order.
 {¶ 91} 27. On October 18, 2001, the interpreting radiologist, Dr. Abrams issued an addendum to his report regarding the left shoulder MRI. Dr. Abrams addendum states:
 {¶ 92} "I have been asked by Dr. Paley to review this examination with specific attention to the possibility of rotator cuff tendonitis rather than a tear. On further review of the examination, there is some minimal low-grade signal abnormality seen in the mid-fibers of the supraspinatus tendon consistent with tendonosis. This could represent mild tendonitis or tendon degeneration."
 {¶ 93} 28. Following a November 30, 2001 hearing, a staff hearing officer ("SHO") issued an order stating that the DHO's order of October 10, 2001 is modified to the following extent:
 {¶ 94} "The employer's C-86 filed 07/25/2001 is denied. It is the finding of the Staff Hearing Officer that the claimant's physician of record [sic] failure to respond to the employer's light duty job offer does not constitute a basis for termination of the claimant's temporary total disability compensation benefits, especially when medical evidence on file continues to clearly document the continued temporary disability of the claimant due to the 06/07/2000 industrial injury.
 {¶ 95} "This order is based upon the medical reports of Dr. Paley 04/26/2001, 07/11/2001, 06/14/2001, 08/12/2001, and the evidence adduced at the hearing."
 {¶ 96} 29. On February 6, 2002, the commission mailed an order refusing to hear relator's administrative appeal from the SHO's order of November 30, 2001.
 {¶ 97} 30. In the meantime, on November 6, 2001, claimant was examined, on behalf of Dayton Foods, by Steven S. Wunder, M.D. Dr. Wunder wrote:
 {¶ 98} "On August 14, 2001, he had a[n] MRI scan of the left shoulder. He had a small subchondral cyst over the posterior humeral head. There was no bone marrow edema or joint effusion. He had a type I acromion. There was no rotator cuff tear. He had a possible loose body over the anterior aspect of the humeral head. There was no significant left AC joint hypertrophy. He had pain at the extremes noted on September 5, 2000. He was advised to pursue surgery.
 {¶ 99} "An addendum to the open MRI of the left shoulder report dated August 14, 2001, was reviewed. A minimal low-grade signal abnormality was seen in the mid fibers of the supraspinatus tendon compatible with tendinitis, mild tendonitis or tendon degeneration.
 {¶ 100} "This information was all taken into consideration.
 {¶ 101} "It is my understanding this claim has been recognized and allowed for a left shoulder strain, left shoulder rotator cuff tendonitis, and left shoulder rotator cuff tear. I believe these conditions from the industrial injury have resolved. The MRI scan was unremarkable for a rotator cuff tear. There was no evidence of impingement on the MRI, and there was a type I acromion and no AC joint hypertrophy. Furthermore, I do not believe that the loose body was related to the industrial injury. Quite clearly, there was no evidence of a bone contusion, fracture or joint effusion to suggest trauma as the cause of the lose body.
 {¶ 102} "I believe he has reached maximum medical improvement from the injury that occurred on June 7, 2000.
 {¶ 103} "I do not believe that surgery would be medically indicated or necessary for the injury that took place on June 7, 2000.
 {¶ 104} "I believe he can return to his prior job duties and tasks. I would have him avoid any repetitious overhead activity."
 {¶ 105} 31. On January 10, 2002, citing Dr. Wunder's report, relator moved to terminate TTD compensation on grounds that the industrial injury had reached MMI.
 {¶ 106} 32. On January 15, 2002, claimant moved for authorization of an arthroscopic evaluation and subacromial decompression. In support, claimant submitted a report, dated December 21, 2001, from Dr. Paley stating:
 {¶ 107} "* * * I have reviewed the independent medical examination performed by Dr. Steven Wunder on Mr. Unger. This examination was performed on November 6, 2001. Dr. Wunder comes to the conclusion that Mr. Unger has reached maximum medical improvement and that his current symptoms are not related to the industrial accidents [sic] of June 7, 2000. In reviewing Dr. Wunder's medical report, I do not follow his line of reasoning. Dr. Wunder accurately describes the history of the injury as well as the subsequent care. On the evaluation by Dr. Wunder, Mr. Unger clearly continues to be quite symptomatic. According to Dr. Wunder's physical examination, Mr. Unger has rotator cuff impingement signs. He also has painful range of motion of the left shoulder. Dr. Wunder does not adequately assess the integrity of the rotator cuff with resisted testing.
 {¶ 108} "It is obvious based on the examination by Dr. Wunder that Mr. Unger continues to be quite symptomatic with evidence clinically of rotator cuff tendonitis. This corresponds well with the MRI findings that were previously obtained on Mr. Unger's left shoulder. His examination also corresponds well with multiple other physical examinations including that of myself and Dr. Woodard who like myself is a Board Certified Orthopedic Surgeon with great expertise in the examination of shoulder injuries. I do not understand how Dr. Wunder can state that Mr. Unger's conditions from the industrial injury have resolved when he has such continued clinical findings of left shoulder pain, weakness, and impingement signs.
 {¶ 109} "As a Board Certified Orthopedic Surgeon with fellowship training in shoulder surgery, it is my experience that injuries to the rotator cuff that are refractory to cortisone injections, physical therapy, and antiinflammatory medications, require arthroscopic evaluation and subacromial decompression.
 {¶ 110} "This surgical procedure has been requested previously and been denied. It has been my contention all along that if Mr. Unger would have undergone this surgery initially, after failure of the conservative treatment, he would have long since returned to the work force and been a productive member of society. Therefore, it is my opinion that Mr. Unger requires a left shoulder arthroscopic examination and subacromial decompression. It is my feeling that this surgery is required due to the injury sustained at work on June 7, 2000.
 {¶ 111} "I also take exception with Dr. Wunder's assessment that the MRI does not show any evidence of a bone contusion, joint effusion, or evidence of acute trauma. The MRI was obtained on August 14, 2001, which is approximately 14 months after the injury. Anybody with any reasonable medical training should know that an MRI obtained 14 months after an acute injury will not show acute evidence of an injury to the bone such as a bone contusion, fracture, or joint effusion. Mr. Unger was found to have a large loose body within the shoulder joint on the MRI of August 14, 2001. Individuals do not just have loose bodies within the shoulder. A specific injury must occur to cause a loose body to form. Mr. Unger has no past history of problems with the left shoulder prior to the accident of June 7, 2000. The mechanism of injury of a large shipping cabinet falling on him could, in my opinion, be the source of this loose body in addition to the injury to the rotator cuff."
 {¶ 112} 33. On February 5, 2002, Dr. Wunder wrote:
 {¶ 113} "* * * There was no rotator cuff tear noted on his MRI. Dr. Paley apparently requested the radiologist to re-read the MRI and they indicated that there was only a minimum low-grade signal abnormality in the mid fibers of the supraspinatus tendon compatible with tendonitis or degeneration. This is not an unusual finding in a 47-year-old male and would not be considered traumatic. His MRI scan showed no evidence of impingement nor did it document a rotator cuff tear.
 {¶ 114} "My opinion in unchanged after reviewing Dr. Paley's December 21, 2001, report. The rotator cuff was intact with resisted testing. Dr. Paley obviously did not read my report as I noted normal strength around the shoulder girdle region on several occasions. He indicated surgery was needed so that he could return to work and be a productive member of society. He has been able to continue work. In fact he worked for a year until he saw Dr. Paley.
 {¶ 115} "I don't believe an arthroscopic exploration would be indicated or necessary for the patient's industrial injury. A subacromial decompression would not be indicated or necessary for the allowed conditions or his industrial injury."
 {¶ 116} 34. On March 8, 2002, Dr. Paley wrote:
 {¶ 117} "I have reviewed for a second time Dr. Wunder's physical examination and conclusions on Mr. Unger dated November 6, 2001. Within his physical examination Dr. Wunder does indicate that there are impingement signs about Mr. Unger's left shoulder. He also states that he has pain with resisted strength testing about the left shoulder. Both of these are indicative of an injury to the rotator cuff. I do not see how Dr. Wunder can, therefore, conclude that the patient has a normal rotator cuff.
 {¶ 118} "It is still my opinion as a Board certified orthopedic surgeon with Fellowship training in shoulder surgery that Mr. Unger has an injury to the rotator cuff consisting of left shoulder rotator cuff tendonitis. This was seen on the MRI. This should not be considered age-related changes as discussed in Dr. Wunder's letter. Certainly, MRI findings in conjunction with clinical findings seen on Mr. Unger's examination should lead to the conclusion that Mr. Unger has sustained an injury to the rotator cuff and requires the previously-requested surgery."
 {¶ 119} 35. Following an April 19, 2002 hearing, a DHO issued an order granting Dayton Foods' January 10, 2002 motion to terminate TTD compensation and denying claimant's January 15, 2002 motion for authorization of arthroscopic evaluation and subacromial decompression. The DHO relied upon the medical reports of Dr. Wunder dated February 5, 2001 and November 6, 2001.
 {¶ 120} 36. Claimant administratively appealed the April 19, 2002 DHO's order.
 {¶ 121} 37. Following a May 29, 2002 hearing, an SHO issued an order vacating the DHO's order of April 19, 2002. The SHO's order of May 29, 2002 states:
 {¶ 122} "It is the finding of the Staff Hearing Officer that the claimant's request for authorization for further treatment with Dr. Paley and for arthroscopic surgery is granted. The Staff Hearing Officer finds the reports of Dr. Paley, dated 12/21/01 and 3/8/02 to be persuasive in both the claimant's need for surgery and its causal relationship to the 6/7/00 industrial injury.
 {¶ 123} "Temporary total disability compensation is to continue from the date of last payment to 7/4/02, based on the C-84 from Dr. Paley dated 2/11/02 and 4/30/02."
 {¶ 124} 38. On June 27, 2002, another SHO mailed an order refusing relator's administrative appeal from the SHO's order of May 29, 2002.
 {¶ 125} 39. On October 2, 2002, relator, Dayton Foods, filed this mandamus action.
 Conclusions of Law {¶ 126} Three issues are presented: (1) whether the commission abused its discretion in denying Dayton Foods' July 25, 2001 motion to terminate TTD compensation, (2) whether the commission abused its discretion by granting authorization for the arthroscopic shoulder surgery, and (3) whether the commission abused its discretion in ordering the continuation of TTD compensation based upon the C-84s from Dr. Paley dated February 11, 2002 and April 15, 2002.
 {¶ 127} Finding no abuse of discretion with respect to any of the three issues noted above, it is the magistrate's decision that this court deny relator's request for a writ of mandamus, as more fully explained below.
 {¶ 128} Again, the first issue is whether the commission abused its discretion in denying Dayton Foods' July 25, 2001 motion to terminate TTD compensation on grounds that Dr. Paley allegedly failed to respond to Dayton Foods' job offer.
 {¶ 129} R.C. 4123.56(A) provides that TTD compensation shall not be paid "when work within the physical capabilities of the employee is made available by the employer."
 {¶ 130} Supplementing the statute, Ohio Adm. Code 4121-3-32(A) provides the following definitions:
 {¶ 131} "(3) `Suitable employment' means work which is within the employee's physical capabilities.
 {¶ 132} "* * *
 {¶ 133} "(6) `Job offer' means a proposal, made in good faith, of suitable employment within a reasonable proximity of the claimant's residence. * * *"
 {¶ 134} Ohio Adm. Code 4121-3-32(B)(2) provides that TTD compensation may be terminated after a hearing:
 {¶ 135} "(d) Upon the finding of a district hearing officer that the employee has received a written job offer of suitable employment."
 {¶ 136} There is scant case law applying that portion of R.C.4123.56(A) noted above. The only mandamus case from the Supreme Court of Ohio involving that statutory provision is State ex rel. Coxson v. DairyMart Stores of Ohio, Inc. (2000), 90 Ohio St.3d 428.
 {¶ 137} In Coxson, the employer's job offer misstated the restrictions of the claimant's treating physician, Dr. Steele, who had authorized the claimant's return to light duty work. The Coxson court issued a writ of mandamus ordering the commission to vacate its determination that "claimant refused a legitimate light duty offer of employment." Id. at 431.
 {¶ 138} The Coxson court rejected the employer's contention that the job offer was sufficient because the employer had promised to "work with the physician to modify jobs within given restrictions or limitations." Id. at 433. The Coxson court explained:
 {¶ 139} "* * * The difficulty with accepting this argument is that it essentially legitimizes any job offer — no matter how inappropriate — under the guide of later modification. As noted previously, if a job offer is to be sufficient to stop TTC, it must be clear that the job is indeed within claimant's restrictions." Id. at 433.
 {¶ 140} Analysis begins with the observation that Dayton Foods' July 25, 2001 motion did not request termination of TTD compensation on grounds that the claimant had received a written job offer of suitable employment under Ohio Adm. Code 4121-3-32(B)(2). Rather, Dayton Foods moved to terminate TTD compensation on grounds that claimant's treating physician, Dr. Paley, failed to respond to the job offer.
 {¶ 141} Dayton Foods' motion to terminate TTD compensation in essence asserts that: (1) Dr. Paley's response to its inquiries was somehow prejudicial to some right it may have to offer alternative employment, and (2) that the claimant can be penalized if the treating physician somehow prejudices such right. The commission essentially answered both assertions in favor of Dr. Paley and the claimant.
 {¶ 142} Relator's reliance on Coxson, supra, is misplaced. According to relator:
 {¶ 143} "Since Coxson stands for the proposition that temporary total disability benefits will be terminated if the employer's offer of employment specifically defines the position available and provides a specific description of the duties involved with the position, the Industrial Commission should have terminated Unger's temporary total disability benefits." (Relator's brief at 12.)
 {¶ 144} Again, relator did not move for termination of TTD compensation under Ohio Adm. Code 4121-3-32(B)(2) on grounds that the claimant had received a written job offer of suitable employment. Rather, relator moved to terminate TTD compensation on grounds that Dr. Paley somehow obstructed its attempt at making an offer of suitable employment. Coxson lends no supports for relator's claims.
 {¶ 145} Here, relator accuses Dr. Paley of being "steadfastly uncooperative." Dayton Foods argues:
 {¶ 146} "* * * Dr. Paley not only was inconsistent with his assertions that Unger is temporarily and totally disabled, but he also stonewalled Unger's return to work. After two separate attempts, Dr. Paley finally provided Dayton Foods with restrictions as to Unger's return to work on 05-07-01. Based on Dr. Paley's representations, Dayton Foods then offered Unger a clearly defined light duty position with restrictions. Dr. Paley refused to respond to Dayton Foods offers of this employment, which were made on 05-08-01, 05-24-01 and 07-06-01. His failure to respond completely stonewalled Unger's ability to return to his former position, even in the face of Unger's dire financial need. Dayton Foods was then left with no other alternative than to seek the termination of Unger's temporary total disability compensation." (Reply brief at 2.)
 {¶ 147} The facts are that the day after Dr. Paley certified on the bureau's C-84 form that claimant was unable to return to his former position of employment and that claimant could not return to "other employment including light-duty alternative work, modified work or transitional work," Mr. Farley faxed to Dr. Paley a letter that, in effect, refused to accept Dr. Paley's C-84 certification that claimant cannot return to any type of work. Mr. Farley asked Dr. Paley to complete the employer's medical form. Dr. Paley did complete the employer's medical form and faxed it to Mr. Farley 11 days later on May 7, 2001. Dr. Paley, as previously noted, checked "sedentary work" on the employer's medical form and also wrote "off work thru 6/26 until TX [treatment] provided." The day after Mr. Farley received from Dr. Paley the employer's completed medical form, Mr. Farley again wrote to Dr. Paley informing him that "Mr. Unger can return to work as the Bakery Manager under the restrictions you placed on the Attending Physician's Report faxed on May 7, 2001." Notwithstanding Mr. Farley's medical assertion that contradicted Dr. Paley's C-84 and the handwritten note on the employer's medical form, Mr. Farley then requested that Dr. Paley respond by May 11, 2001 "indicating your acceptance of the job modifications." Dr. Paley did not respond.
 {¶ 148} Under the circumstances, it is difficult for this magistrate to see how Dr. Paley can be accused of being uncooperative. While Dayton Foods can certainly ask the treating doctor to reconsider his medical opinions or clarify them, it cannot compel the doctor to conform his opinion to the employer's view.
 {¶ 149} In short, the commission did not abuse its discretion in denying relator's July 25, 2001 motion to terminate TTD compensation on grounds that Dr. Paley allegedly failed to respond to relator's job offer.
 {¶ 150} The second issue is whether the commission abused its discretion by granting authorization for the arthroscopic shoulder surgery. According to relator, because Dr. Paley's December 21, 2001 and March 8, 2001 reports state that the requested surgery is related to rotator cuff tendonitis and because the August 14, 2001 MRI report does not list rotator cuff tendonitis as a finding, Dr. Paley's reports cannot support shoulder surgery. (Relator's brief at 13-15.) In making this argument in its opening brief, relator seems to be unaware of Dr. Abrams' addendum to his MRI report in which he states that the MRI "could represent mild tendonitis or tendon degeneration." However, in its reply brief, relator asserts:
 {¶ 151} "* * * Only after Dr. Paley's prompting did the radiologist issue an addendum to his report, at which time the radiologist then found `some minimal low-grade signal abnormality' in the supraspinatus tendon of the rotator cuff. According to the radiologist, this `could represent mild tendonitis or mild degeneration.' The radiologist had to examine the MRI for a second time to identify what he thought could be tendonitis or maybe some other condition, all at the prompting of Dr Paley." Id. at 5.
 {¶ 152} Because relator does not concede its argument in its reply brief, relator seems to suggest that the radiologist's addendum cannot support the shoulder surgery related to tendonitis because the addendum was prompted by Dr. Paley. This suggestion lacks merit.
 {¶ 153} According to relator, because the MRI indicated a "loose body," and because the industrial claim is not allowed for "loose body," and because Dr. Paley's September 5, 2001 office note indicates he will remove the "large loose body noted on the MRI," the surgery cannot be authorized because it is to repair a non-allowed condition. Relator relies upon State ex rel. Griffith v. Indus. Comm. (1999),87 Ohio St.3d 154. The Griffith decision actually supports the commission's authorization of the surgery. In Griffith, the court states:
 {¶ 154} "* * * [T]he existence of a contributing nonallowed condition is not a legitimate reason for refusing to pay for medical treatment independently required for an allowed condition, State ex rel.Waddle v. Indus. Comm. (1993), 67 Ohio St.3d 452, 457." Id. at 156.
 {¶ 155} To begin, in his December 21, 2001 report, Dr. Paley opined that the June 7, 2000 injury could be the source of the loose body in addition to the injury to the rotator cuff. Thus, Dr. Paley presents evidence of a direct and proximate causal connection between the loose body and the industrial injury.
 {¶ 156} Even if it can be argued that surgery cannot be authorized if its sole purpose were to remove the loose body, that would not preclude surgery for the tendonitis even if the loose body is removed in the process. Griffith, supra.
 {¶ 157} The third issue is whether the commission abused its discretion in ordering the continuation of TTD compensation based upon the C-84s from Dr. Paley dated February 11, 2002 and April 15, 2002.
 {¶ 158} As previously noted, the SHO's order of May 29, 2002 continued the payment of TTD compensation "from the date of last payment to 7/4/02, based upon the C-84 from Dr. Paley, dated 2/11/02 and 4/30/02."[1]
 {¶ 159} On February 11, 2002, Dr. Paley certified a period of TTD from March 2, 2002 to May 2, 2002. On the C-84, Dr. Paley states that the last examination occurred January 22, 2002.
 {¶ 160} On April 15, 2002, Dr. Paley certified a period of TTD from May 2, 2002 to an estimated return-to-work date of July 5, 2002. On the C-84, Dr. Paley states that the last examination occurred on April 2, 2002.
 {¶ 161} According to relator:
 {¶ 162} "It is understandable that a doctor would certify a period of temporary total disability benefit from the date of last examination to an anticipated return to work date. On each of these C-84s, however, Dr. Paley indicated that a new period of temporary total disability benefits was to begin weeks beyond the date that he either executed the C-84 or saw the claimant. These C-84's are totally invalid and inappropriate to determine the basis for payment of temporary total disability benefits. * * *" (Relator's brief at 16-17.)
 {¶ 163} Apparently, relator would have no objection to the C-84s had Dr. Paley certified TTD from the date of the last examination to the estimated return-to-work date listed on the C-84. Apparently, relator objects that Dr. Paley certifies TTD beginning on a date that is prospective of the date of certification.
 {¶ 164} It appears from the record that Dr. Paley periodically certified TTD. It is worth observing that Dr. Paley's C-84 dated April 15, 2002 prospectively certifies TTD beginning May 2, 2002 which is the end date of the TTD certification on the previous C-84 dated February 11, 2002. Thus, the April 15, 2002 C-84 simply continues the prior certification.
 {¶ 165} The magistrate can think of no logical reason why certification of a period of TTD that is prospective of the date of certification detracts from the value of the C-84s at issue. Relator cites to no authority to support its proposition that the C-84s are invalid due to the prospective certification of TTD. Relator's challenge to the C-84s lacks merit. See State ex rel. Kroger Co. v. Indus. Comm.
(1997), 80 Ohio St.3d 483, 488 (the estimated return-to-work dates offered by the attending physician were only seven to twelve months distant; this was not unreasonable or unrealistic, nor is it uncommon).
 {¶ 166} Accordingly, for all of the above reasons, it is the magistrate's decision that this court deny relator's request for a writ of mandamus.
Kenneth W. Macke, Magistrate.
[1] There is no C-84 from Dr. Paley dated April 30, 2002. Apparently, the SHO was referring to the C-84 dated April 15, 2002.